JAMES CALDWELL, APPELLANT vs. JOHN TAGGART AND MARY HIS
WIFE, AND OTHERS.

Where a bill was filed *to compel the execution of securities for money loaned,*
which securities, it was alleged in the bill, were promised to be given upon
particular real estate purchased by the money loaned, and the complainants
had omitted to make the prior mortgagees of the premises on which the secu-
rities were required to be given, parties to the bill, the court said; it has
been urged in reply to those grounds of reversal for want of parties or for want
of due maturation for a final hearing, that nothing is ordered to be mortgaged
or sold besides the interest of the party who is ordered to execute the mort-
gage, or whose interest is to be sold, whatever that may be. But *this* we
conceive to be an insufficient answer. It is not enough that a court of
equity causes nothing but the interest of the proper party to change owners.
Its decree should terminate and not instigate litigation. Its sales should tempt
men to sober investment, and not to wild speculation. Its process should act
upon known and definite interests, and not upon such as admit of no medium
of estimation. It has means of reducing every right to certainty and precision;
and is therefore bound to employ these means in the exercise of its jurisdic-
tion.

The general rule is, " that however numerous the persons interested in the sub-
ject of a suit, they must all be made parties, plaintiff or defendant, in order that
a complete decree may be made; it being the constant aim of a court of equity
to do complete justice, by embracing the whole subjects; deciding upon and
settling the rights of all persons interested in the subject of the suits; *to make
the performance of the order perfectly safe to those who have to obey it,* and
to prevent future litigation.

Where in the course of proceedings in a suit in chancery in the circuit court, it
is apparent that the father has not presented the interests of his children for
protection, the court said; although there is no appeal taken in behalf of the
children, the court, while interfering to prevent the breach of a trust in behalf
of the father, can hardly be expected to pass over without noticing an omission
in the father, amounting to a breach of trust, to the prejudice of his infant chil-
dren. [201]

APPEAL from the district court of the western district
of Virginia.

The appellees, who are citizens of Maryland, filed their
bill in the court of the United States, for the western district
of Virginia, in which the material allegations set forth are,
that on the 22d of June 1809, Grizzle Taggart, mother of
John Taggart, conveyed to William Copeland Goldsmith and
James Caldwell, all her estate for the uses and purposes

mentioned in the deed exhibited with the bill. A part of the estate so conveyed consisted of a debt due to the said Grizzle from Keller and Foreman of Baltimore, which was secured by a mortgage on valuable real property, called the Salisbury Mills.

That about the year 1817, Caldwell, who was the nephew of Grizzle, importuned her and her son John and his wife, to consent to permit him to receive the money due on the mortgage, and to use it in the purchase of an estate called the White Sulphur Springs, situate in Greenbrier county, Virginia, and which belonged to the heirs of Michael Bowyer; and to induce them to yield their assent, he represented that estate to be very valuable, and promised that he would encumber it (when purchased) by a mortgage to secure the money which he should receive from Keller and Foreman.

The complainants further state, that consent was accordingly yielded on the conditions proposed; in consequence of which Caldwell (who was then sole trustee, the other being dead,) received from Keller and Foreman the sum of fifteen thousand seven hundred and sixty dollars and seventy cents, in discharge of their mortgage, which he appropriated to the purchase of several shares of the copartners of the said Michael Bowyer in the said estate, or paid therewith for some shares previously purchased.

Some time afterwards, as the complainants further allege, in order to satisfy Grizzle Taggart of the propriety of his purchase, and that the security promised would be ample, Caldwell brought her from her residence in Baltimore to the White Sulphur Springs. That she returned about the beginning of October 1817, well pleased with the property; that Caldwell promised to execute the mortgage immediately after her return, but that in a very short time Grizzle departed this life, without it having been done.

A few days after this event, Caldwell, secretly and unknown to the complainants, as they state, executed a mortgage in favour of Jeremiah Sullivan and others, on his interest in the White Sulphur Spring estate, to secure the sum of twenty thousand dollars. A second mortgage, to

secure the same debt, was executed by Caldwell, bearing date the 15th of September 1819, and both were duly recorded (and are in the record). It is stated that some defect unknown to the complainants, was supposed to exist in the mortgage of the 24th of October 1817, which was the reason for the second being executed.

After the death of Grizzle Taggart, her son, John Taggart, as the complainants state, applied to Caldwell to execute the mortgage which he had promised on the White Sulphur Spring estate. He then informed the said John, that he had executed the mortgage of the 24th of October 1817, before mentioned, on which the said John upbraided him with his breach of trust. Caldwell then promised to extinguish the incumbrance out of the annual profits of the estate, and to make provision for the debt created as before mentioned. Nothing however was done; the complainants being without any written evidence of their claim until the 9th of September 1823, when Caldwell executed a paper, exhibited with the bill, acknowledging the sum of fifteen thousand two hundred and sixty dollars and seventy cents to be due on account of principal, and two thousand nine hundred dollars on account of interest.

The bill further states, that the mortgagees, Jeremiah Sullivan and others, instituted a suit to foreclose the equity of redemption; but before the case was brought to a hearing, a certain Richard Singleton purchased the mortgage and obtained a transfer thereof; that to secure the money paid for the mortgage and other money advanced, he obtained a deed of trust from Caldwell on his interest in the estate, that is four-sevenths obtained by purchase, and one-seventh in right of his wife, who is a daughter of Michael Bowyer.

The complainants further state, that the profits of the said estate are great; but that such is the imprudence of Caldwell that he has never paid any part of the principal or interest on the mortgage, either before or since Singleton acquired it; that he is incurring other large debts, and that he has no other means to pay the money due to them except his interest in the White Sulphur Spring estate. They insist that they hold an equitable lien on that estate so far

as Caldwell's interest extends; and they pray that it may be subjected to their debt; that another trustee may be appointed to execute the trust created by the deed of the 22d of June 1809, and for general relief.

To this bill James Caldwell and his wife filed a joint answer, sworn to on the 30th of September 1827, the material statements of which are the following:

He admits the execution of the deed of the 22d of June 1809; though he states that he was not apprized of its existence until after it was recorded. He admits that he received from Keller and Foreman the sum of fifteen thousand seven hundred and sixty dollars and seventy cents, due to Grizzle Taggart, and embraced in the deed executed by her; but he alleges that *he* was her debtor to that amount, and that to secure the debt *he* had given a deed of trust to Nicholas Brice, as trustee. That at his request, Grizzle and her son John consented to release his deed of trust, so as to enable him, Caldwell, to sell the property (Salisbury Plains) to Keller and Foreman, which was accordingly done, and he received the money. That the release exhibited with the answer was executed by Nicholas Brice, Grizzle Taggart, John Taggart and Mary his wife, when he was not present.

He alleges that Brice agreed, on his behalf, without consulting him, that the debt due from him to the said Grizzle, or a part thereof, should be vested in bank stock, and that the agreement and instrument of writing mentioned in the release contemplated that object; that he never executed any such writing, though he was informed before the delivery of the release of the proposition to invest the money due from him in bank stock, and refused to accept it on that condition, of which the parties interested were informed; but that the release was afterwards, by their consent, or without objection from them, delivered. That he was unwilling to accept the release on the condition proposed, because his object in desiring it was the use of the money.

He alleges that the money which he obtained from Keller and Foreman was applied to the payment of his debts, and not to the purchase of the White Sulphur Springs, or any interest therein, or any thing due therefor.

VOL. IV.—Z

He denies that it was his object to invest the money obtained by him in the White Sulphur Spring property; or that he obtained the release by any such representation, or by any promise to give an incumbrance thereon. That he acquired the White Sulphur Spring property with other funds, and never contemplated securing the debt due to Grizzle Taggart on that property; but expected to pay it out of a large debt due to him from another person, which he failed to realize.

He admits that Grizzle Taggart visited the White Sulphur Springs; that he returned with her in 1817; but denies that she was brought there with the views mentioned in the bill. He says he does not recollect, and has no reason to believe that a single word passed between him and her in relation to his giving a mortgage or other lien on that property, either during the said visit, or at any other time.

Caldwell denies that there was any stipulation between him and John Taggart and Mary his wife, or either of them, that the debt should be secured by a mortgage on the White Sulphur Spring property. He states that he does not recollect that the said John ever upbraided him with a breach of trust. He admits that he had a conversation with John in 1819, upon the subject of his giving the mortgage to secure other persons, and that John Taggart then said, that he ought, in the first place, to have secured the debt in which he was interested. In reply to which, he stated that he was willing to secure that debt by a lien on the property, as soon as the other was extinguished, which he supposed he would be able to do after the lapse of some time. Previous to this, Caldwell states that he has no recollection of having conversed with John Taggart on the subject of giving a lien, though the fact of his having executed the other mortgage was known to John as early as 1817.

He states that he does not believe that John Taggart ever thought that he had deceived him. That there was no privacy in giving the mortgages of the 24th of October 1817 and 15th of September 1819, which he admits he executed to secure the same debt. As evidence to show that

John did not believe he had been deceived, he exhibits a letter from him, which is in the record.

He admits the execution of the paper exhibited with the complainants' bill, bearing date the 9th of September 1823; the pendency of a bill to foreclose the equity of redemption on the mortgage of the 15th of September 1819; the subsequent purchase of Richard Singleton, and the execution of a deed of trust for his benefit, as stated in the bill.

James Caldwell then proceeds to state in his answer, the interest which he has in the White Sulphur Spring property. 1. That his wife is entitled to one-seventh, as one of the heirs of Michael Boyer. 2. That she is entitled to another seventh, by virtue of a conveyance made to her by her brother, John Bowyer. 3. He claims one-seventh, by purchase, from William Bowyer, to whom he paid only one hundred dollars of the purchase money. The contract is referred to, and filed among the papers of this court. He states that William Bowyer is dead, having made a will which is exhibited and copied into the record. 4. He claims another seventh by purchase from William Bedford, who is stated to have purchased the interest of Thomas Bowyer, a son of Michael. That for this interest he stands indebted six thousand dollars, with interest, for which a deed of trust was executed on the property purchased, a copy of which is exhibited; and a suit has been brought to enforce this lien. 5. He claims the interest of James Bowyer, another son of the said Michael. The remaining two shares, he states, are in Frances Bedford and Elizabeth Copeland, daughters of Michael Bowyer.

Caldwell insists, that if, contrary to his expectation, the complainants should establish a specific lien, on any part of the said property, that it can only extend to such interests as he owned when such lien originated; and that it ought not to be extended to defeat the rights of others, or their equitable lien for purchase money due to them from him: and he requires that their rights shall be precisely ascertained and adjusted, before any effort shall be made to enforce such lien in favour of the complainants, and that partition shall be made according to the rights of the parties.

Caldwell further states, that an indenture was executed by him and his wife, and the other persons interested, by which it was agreed that all the lands and tenements of which Michael Bowyer died seised, should be divided between the parties, by commissioners chosen for that purpose, except two hundred acres, including the White Sulphur Springs, buildings, &c. which should be held in common ; that this partition has never been made. He insists that if the complainants should establish the lien demanded by them, that partition should be made according to said agreement, and his part in the two hundred acres first subjected.

He admits that the White Sulphur Spring estate is valuable ; but regrets that the profits are not as great as estimated by the complainants. He deems it unnecessary and irrelevant to exhibit a schedule of his receipts and expenditures, or an account of his management and history of his domestic affairs. He states that he is desirous of paying all the debts which he owes, and particularly that claimed in this case, the justice of which he has never denied; that he trusts an apology will be found for not having effected that sooner, in the embarrassed situation of his affairs. Such was the condition of the White Sulphur Spring property when he obtained possession, that he has been compelled to incur many expenditures to make it at all productive. He has well founded hopes, that if he is suffered to continue his exertions, that in a few years he will be able to do full justice to all the world; but that the interests of his creditors require that he should not be destroyed by an unmerciful pressure of their demands.

Caldwell objects to the measure of relief sought by the complainants, as not being warranted by the laws of the land, the principles of equity, or the dictates of justice. So far as they set up any pretended parol agreement, he insists that it is within the operation of the statute of frauds and perjuries; of which he prays the benefit, as if it had been specially pleaded. Caldwell moreover states, that he feels it his duty to protect the trust fund committed to his care from any appropriation not contemplated by the donor. He denies the right of the complainants to take that fund

[Caldwell *vs.* Taggart et al.]

from the control of the trustees ; or to exhaust or expend the principal ; and says that the interest, or profits only, can be applied to the use of the cestui que trusts.

The defendant, the wife of James Caldwell, states that her interests in the White Sulphur Spring property are, in some respects, different from those of her husband ; and that she is advised that no agreement made by him, in which she has not concurred, in the form prescribed by law, affects her rights, derived by descent, devise, or conveyance. She refers to a copy of the deed (which is not in the record) executed by her brother John Bowyer, to show that she is entitled to the sole and exclusive use and benefit of his share. As to the interest of her deceased brother, William Bowyer, she contends that she is entitled to the same, or the purchase money thereof, during her life, in the same exclusive and separate manner ; and that after her death, the property passes to her children and nephew. She refers to the agreement between her husband and the said William Bowyer, to show that the latter had the privilege to revoke the contract, if the purchase money should not be paid ; which privilege she says passed to her by the will of the said William, which privilege she claims to exercise, so far as the same may be necessary for her complete protection. She prays that she may be permitted to answer separately, or that her rights may be investigated and decided, as if she had done so. She says she has no knowledge of the justice of the debt claimed, and how it originated.

Depositions were taken in the district court, establishing certain facts which are sufficiently referred to in the opinion of this court; and when the cause came on to a hearing, the court made the following decree :

This cause came on to be heard on the bill, answers, exhibits, and examination of witnesses, and was argued by counsel. On consideration whereof, and for reasons set forth in a written opinion filed among the papers in this cause, it is adjudged, ordered and decreed, that the defendant, James Caldwell, do forthwith execute a proper deed of mortgage to Silas H. Smith, who is hereby appointed trustee for that purpose, providing for the annual payment to

[Caldwell *vs.* Taggart et al.]

the said trustee, of the legal interest on the sum of fifteen thousand seven hundred and sixty dollars and seventy cents, the amount of the sum withdrawn by the said defendant from the trust-fund; to commence this day; to be paid by the said trustee to John Taggart during his life, and on his death, that the principal, with any interest that may accrue after the death of the said John, to be paid to the children of said John and Mary his wife, according to the provisions of the deed executed by Grizzle Taggart on the 22d of June 1809, and filed among the papers in this cause. And it is further adjudged, ordered and decreed, that the said defendant pay unto the plaintiff, John Taggart, the sum of seven thousand five hundred and thirteen dollars and forty cents, being the amount of interest now due on the said sum of fifteen thousand seven hundred and sixty dollars and seventy cents; and in case the said defendant shall make default in the payment of the said sum of money, so that the same or any part thereof shall remain due and unpaid on the 5th of August next, then it shall be the duty of the marshal of this court to proceed to sell all the right, title and interest which the defendant may have in the White Sulphur Spring estate, in the county of Greenbrier, for ready money; having first advertised the time and place of sale, in some newspaper published in Richmond, Staunton, and Lewisburg, for thirty days before such sale, and that he report his proceedings to this court. And it is further adjudged, ordered and decreed, that the said defendant pay unto the plaintiffs their costs expended in the prosecution of this suit.

From this decree the said James Caldwell prayed and obtained an appeal to the supreme court of the United States.

The case was argued by Mr Wirt for the appellant, and by Mr Sheffy for the appellees.

Mr. Wirt contended, 1. That the necessary and proper parties had not been called before the district court when the decree was pronounced.

2. That as to those who had been called before the court, the cause had not been matured for a decree, when the same was pronounced.

[Caldwell *vs.* Taggart et al.]

3. That the decree is inconsistent with the relief prayed for by the bill.

4. That the decree was not justified by the evidence in the cause.

5. That even if such a decree could have been justified by the general evidence, it would only have been after the prior liens on the property had been marshalled, by the report of a master commissioner, and the remaining interest of Caldwell in the property precisely ascertained and fixed by the decree.

Mr Sheffy, for the appellees, argued; that there is no error in the decree injurious to the rights of the appellant.

Mr Justice JOHNSON delivered the opinion of the Court;

The material facts of this case may be thus stated :

Grizzle Taggart, wishing to make provision for the family of her son John Taggart, conveyed a considerable property to one Goldsmith, and the defendant, James Caldwell, to the use of herself for life, then to the joint use of John Taggart and his wife for life, to the use of the survivor for life, and finally, to be distributed among their children. The children, together with their parents, preferred this bill. The deed bears date the 22d of June 1809, and contains a clause, empowering John and his wife, or the survivor of them, to sell and dispose of the trust property, "and invest it in other property subject to the like uses and trusts, and to repeat the same as often as they may think beneficial for them and their children."

In July 1812, Goldsmith being dead, Caldwell prevailed upon the cestui que trusts, Taggart and wife, to permit him to make use of a large sum of money raised upon the trust property, and secured it to them by a mortgage on the Salisbury mills, executed to Nicholas Brice, in terms adapted to the purposes of the original trust deed. Afterwards, in the year 1816, Caldwell prevailed upon the cestui que trusts to make another change of application of the trust found in his favour, by executing a release of the mortgage to enable him, as is alleged in the bill, to make a purchase

of the Sulphur Springs in Virginia, and under a promise to mortgage that property when purchased, to secure the money according to the original trusts.

These facts make out the complainants' case ; and excepting the three allegations, that the last loan was solicited for a specific purpose, that it was applied to that purpose, and under a promise that the property when purchased should be mortgaged to secure the loan according to the trusts ; the answer admits the facts set out in the bill. It is then a clear case for relief ; since the defendant Caldwell, uniting in himself the two characters of trustee and debtor to the trust fund, was guilty of a clear breach of trust in availing himself of the release of 1816, without seeing the debt well secured, agreeably to the deed of 1809. He must in any event be decreed to substitute such security as he ought to have taken upon any other change of investment effected in pursuance of the original trust. But the complainants here go for specific relief, claiming to stand in the relation of cestui que trusts or mortgagees of a specified property ; upon the ground, as to the first relation, of having paid the consideration money ; and as to the second, of having surrendered their existing mortgage upon Caldwell's promise to execute that in contemplation ; and in one or the other or both those rights, to have the property placed in the hands of a receiver, that the income may be applied to extinguish prior incumbrances, and leave the property free to satisfy this claim. The bill also contains the prayer for general relief, but the specific claim must first be disposed of before the general prayer can be considered.

The court below sustained the allegations of the bill relative to the promise to mortgage the specific property, and decreed Caldwell to execute a mortgage accordingly, to secure the principal sum of fifteen thousand seven hundred and sixty dollars. It then goes on to order the interest calculated to the date of the decree, amounting to seven thousand five hundred dollars, to be paid by a day prescribed, or in default thereof, that the property so ordered to be mortgaged to secure the principal, shall be sold to raise the interest. We think it clear that there is an error in this, since the

interests of those in remainder would thus be sacrificed to the first taker.   And although there is no appeal taken in their behalf, yet the court, while interfering to prevent the breach of a trust in behalf of the father, can hardly be expected to pass over without noticing an omission in the father, amounting to a breach of trust, to the prejudice of his infant children.

In an instance therefore in which a decree so obviously needs reforming, it is without reluctance that the court lays hold of such legal grounds for reversing it as may be considered under the appeal taken by the defendant.

The complainants in their bill set out, that soon after receiving and using the release before mentioned, Caldwell purchased the five-sevenths of the interest in the Sulphur Springs, and shortly after mortgaged the same to Sullivan and others, to secure certain large sums which they had assumed for him; that this mortgage was foreclosed according to the laws of Virginia, and finally lifted and assigned to Mr Richard Singleton, who advanced thereon, for the relief of Caldwell, twenty-three thousand dollars, to secure which the latter executed a trust deed to A. Stevenson and F. Bowyer, which it appears became absolute by failure of payment more than a year since.

And when the defendant, Caldwell, as well as Frances Bedford, come to answer to the allegation of the purchaser of the property in question, we find that, although Caldwell has repeatedly executed deeds conveying or incumbering five sevenths of the whole, he does not pretend to make title to more than one-seventh, to wit : the share of James Bowyer.  The rest are either vested in his wife or his children, or incumbered with prior liens, which will probably sweep the whole.

His answer also introduces into the cause a deed of partition, or one partaking of that character, executed by the parties interested in this property, bearing date in 1810, by which a division or distribution has been agreed upon adapted to the nature of the property, and in which every individual has so distinct an interest that it may well be questioned whether, until it is in some way carried into exe-

cution, it will be possible for any purchaser to know what he is buying. This deed has not been copied into the record sent up, but it is presumed that it could hardly have been passed over in the court below.

Of the interests thus introduced into the cause by the answer, that of the children of Thomas Bowyer, as set out in. Mrs Bedford's answer, and that of the children of Mrs Caldwell and Mrs Copeland, as shown by the will of William Bowyer, are wholly unrepresented.

And as to the interest of Mrs Copeland or her representatives, although there was an order for a decree nisi, the decree no where appears to have been entered, nor evidence of the service or return of the rule exhibited in the record.

In reply to all these grounds of reversal, for want of parties, or for want of due maturation for a final hearing, it has been urged that nothing is ordered to be mortgaged or sold beside Caldwell's own interest, whatever that may be. But this we conceive to be an insufficient answer. It is not enough that a court of equity causes nothing but the interest of the proper party to change owners. Its decrees should terminate and not instigate litigation. Its sales should tempt men to sober investment, and not to wild speculation. Its process should act upon known and definite interests, and not upon such as admit of no medium of estimation. It has the means of reducing every right to certainty and precision, and is therefore bound to employ those means in the exercise of its jurisdiction.

There is no want of learning in the books on this subject. The general rule is laid down thus; "however numerous the persons interested in the subject of a suit, they must all be made parties plaintiffs or defendants, in order that a complete decree may be made; it being the constant aim of a court of equity to do complete justice by embracing the whole subject, deciding upon and settling the rights of all persons interested in the subject of a suit; to make the performance of the order perfectly safe to those who have to obey it, and to prevent future litigation." And again, "all persons are to be made parties who are legally or beneficially interested in the subject matter and result of the

suit;" extending in most cases to heirs at law, trustees, and executors.

Thus, in a case in which a remainderman in tail brought a bill against the tenant for life, to have the title deeds brought into court, and there were annuitants on the reversion, and a child interested under a trust term of years prior to the limitation to the plaintiff, that is incumbrances prior and posterior to the plaintiff; Lord Hardwicke, 3 Atk. 570, refused a decree without first making them parties. So, where husband tenant for life, remainder to his wife for life, remainder over, brought his bill without joining the wife; the objection was made and sustained, on the ground that if there was a decree against the husband, it would not bind the wife. 1 Atk. 289.

So, if an under mortgagee brings his bill to foreclose the original mortgagor, he must make the first mortgagee a party. 3 P. W. 643. This is the relation in which the complainants here seek to place themselves in reference to Mr Singleton.

And there are various cases in which, though the heir at law is not a necessary party, he is made such in practice, and the reason assigned is to free the estate from every blame that may lessen its value at the sale. 2 Ves. 431. 3 P. W. 91. 3 Br. Ch. Rep. 229, 365.

And so in cases of indefinite or blended interests, all the participators are necessary parties; as where a residue is devised to several, or even devised by specified shares.

It is clear then that this cause must go back, as well to have the necessary parties made, as to have the decree reformed and reduced to legal precision.

It is true this course might have been avoided, if this court, upon looking through the complainants' case and allowing the full benefit of every thing that has been legally established, had seen that a decree might now finally be rendered against the appellant. It would then have been nugatory to send it back for parties. But such is not the conclusion to which this court has arrived; it has already expressed the opinion, that to a certain extent it is a very clear case for relief, and all the difficulties arise upon the nature of the

relief prayed and granted. There is no knowing what new aspect may be given to the cause, when all the necessary parties come in and answer. But as it is now presented, had the prayer for specific relief upon the Sulphur Springs been out of the cause, it would not have been sent back without such a decree against the defendant, Caldwell, as the court below ought to have rendered.

This cause came on to be heard on the transcript of the record from the district court of the United States for the district of West Virginia, and was argued by counsel; on consideration whereof, it is ordered and decreed by this court, that the decree of the said district court in this cause be, and the same is hereby reversed, and that this cause be, and the same is hereby remanded to the said district court for further proceedings to be had therein, according to law and justice.