WRIGHT AND WIFE AND C. E. MILLER v. EZRA W. MILLER and others.

HANNAH MILLER v. EZRA W. MILLER and others.

The jurisdiction of the court of chancery to set aside decrees obtained by fraud, on an original bill filed for that purpose, has long been unquestioned.

A decree against infants, setting aside a conveyance made in trust for them, without giving them a day to show cause after they become of age, is erroneous; and the infants on an original bill, may be relieved against such decree.

The answer of an infant defendant by his guardian *ad litem*, is not binding upon him, and no decree can be made on its admission of facts. Where relief is sought against infants, the facts upon which it is to be founded must be proved. They cannot be taken by admission.

The real estate of H. M. before her marriage with E. W. M. in 1810, was vested in R. C. in trust, for her support during her life and for her separate use, and also as to the residue of the income and the principal, for her children and the heirs of such children, and failing issue, then for her brother's children. In 1813, after the birth of three children, E. W. M. and wife conveyed a part of the real estate without consideration to A. A. W., who soon after with M.'s aid, filed a bill against M. and wife, R. C. and two of the children, setting up that W. was a *bona fide* purchaser for a valuable consideration, without notice of the trust deed, and praying to set it aside. M. and wife answered, admitting the charges in the bill, and M. procured himself to be appointed guardian *ad litem* for his children and answered for them in like manner. No proofs were taken, and a decree was made on a case agreed upon by counsel. None of the parties were mentioned in the decree as being infants, and it gave them no day in court. It set aside the trust deed, and directed R. C. to release to A. A. W. This release was executed in March, 1816, and in the same month, W. re-conveyed the property to E. W. M. By a similar operation, commenced in January, 1817, and carried on

through W. D. G., (the decree being made in May, 1820,) the residue of the real estate was divested from the trustee, and vested in E. W. M.

*Held,* that the decrees were fraudulent and void as against the children of M. and his wife, and the same were set aside and the property revested in trust for their benefit.

In 1820 and 1821, E. W. M. by an agreement with his wife, (who was then living separate from him,) and with R. C., conferred on her an annuity of $600. This was in consequence of an understanding between them when she joined him in the deeds to W. and G. E. W. M. executed to R. C. to secure the agreement, a mortgage on a part of the same real estate. In June, 1822, he procured a divorce from his wife on the ground of adultery. She received her annuity quarterly, until 1840. *Held,* that she could not disturb the decrees, or the title of E. W. M. under them.

*Her annuity was not affected by the divorce.*

*Held* also, that the children had existing vested interests under the trust deed, which entitled them to file their bill during their mother's life, to have the fund restored and properly invested.

H. M. having been made a defendant with E. W. M. in their suit, it was proper for her to file an original bill in the nature of a cross bill against E. W. M. and her children, asking for similar relief in her own behalf.

*Directions in the decree setting aside the conveyances and former decrees, and ordering an account and re-investment in trust.*

June 9, 10 and 12 ; August 30, 1843.

The original bill was filed March 22, 1836, by Benjamin Wright and Eliza his wife, and Charles W. Miller, against Ezra W. Miller, Hannah Miller, formerly his wife, Ezra Miller, Joseph Miller, Albert A. Westervelt, and Robert Campbell. Mrs. Wright and Charles W., Ezra, and Joseph Miller, were children of Ezra W. and Hannah Miller, and were born in 1811, 1812, 1813, and 1814, respectively. Hannah Miller, who, before her marriage to E. W. M., was Hannah Ryerson, had a large real estate in the city of New-York, and some lands elsewhere, by a devise from her grandfather, Samuel Ellis, who died in 1794. The bill sought to set aside certain conveyances of portions of this real estate, and two decrees of this court affecting the same. On the 13th of August, 1836, Hannah Miller filed a cross bill against Ezra W. Miller and the other parties in the original suit, seeking relief against the same conveyances and decrees.

Answers were put in by the various parties, replications were filed, and a vast quantity of testimony was taken. Wes-

tervelt died pending the suit, and as his interest did not continue, the suit proceeded.

The causes were heard together on pleadings and proofs.

The facts affecting the case, and so much of the pleadings as is material to a correct understanding of it, will be found stated in the opinion of the court.

*J. A. Lott,* for Wright and wife, and C. W. Miller.

*A. W. Bradford,* for Hannah Miller.

*J. Anthon,* with Mesrs. Lott and Bradford.

*B. W. Bonney* and *S. A. Foot,* for Ezra W., Ezra, and Joseph Miller.

*J. L. Riker,* for R. Campbell.

On behalf of the complainants in both suits, the following points were made:

1. The deed of 12th September, 1809, from Hannah Ryerson to Robert Campbell, of all her separate estate, upon the trust therein set forth, was a valid deed, and obligatory on her future husband.

2. Ezra W. Miller had notice of this deed at the time of his intermarriage with Hannah Ryerson, and was therefore privy to it, and bound by its provisions, as much so as if he had been a party to it, as an antenuptial contract.

3. If it had been made in fraud of the marriage contract, it was incumbent on him to have so treated it, and to have applied to the Court of Chancery for relief against it in this view. Not having done so, it is clearly obligatory.

4. This deed secures a life estate in the premises to the wife, remainder in fee to her children, with remainder over to others, should she die without issue.

5. All the proceedings in the Court of Chancery in favor of Westervelt and De Garmo were fictitious, all the averments in

the bills of complaint were untrue, and the whole was a mere contrivance of counsel to change the trustee. This being the object, if those proceedings can be sustained, no greater effect can be given to them than was contemplated, and in this view Ezra W. Miller is a trustee, clothed with the same trusts as Campbell, and must be decreed to account.

6. Contrary to the intent and object of these proceedings, Ezra W. Miller has taken deeds in fee simple absolute from Westervelt and De Garmo, and claims to be the absolute owner, freed from the trusts; these deeds in this view are fraudulent and void.

7. Although Mrs. Miller may be admitted to have had full power to convey her life estate absolutely to her husband, and in this view those proceedings in chancery and the deeds to her husband might bind her. Still it is clear that this was not her intention, and that she has been imposed upon. The proceedings, therefore, are void as to her.

8. They are clearly void as to the remainder men, with regard to whom the whole transaction is a gross fraud.

*Mr. Bonney*, submitted the following points in behalf of Ezra W., Ezra, and Joseph Miller, in the original suit:

I. The complainants have not shown themselves entitled to any such interest in the property in question, as authorizes them now to bring suit, or to ask for the aid or interposition of this court.

II. The deed of trust dated 12th September, 1809, made by Hannah Miller, (then Ryerson,) in contemplation of her marriage with Ezra W. Miller, was a fraud upon him, and no relief founded on that deed can be had against him.

III. No acquiescence of the defendant, E. W. Miller, could give validity to a deed originally fraudulent and void, unless third persons had acquired rights under and in faith of it, by reason of such acquiescence. Here no such question arises. No person has paid money or incurred liabilities on the faith of that deed; it is sought to be made the foundation of an action

by original parties, and it is competent for Miller now to object the fraud.

IV. Whatever may have been the validity or effect of that deed when made, it was completely set aside and made void by the sales made by E. W. Miller and Hannah Miller to Westervelt and De Garmo, and the proceedings thereupon.

V. The sales to Westervelt and De Garmo were made, and the chancery proceedings thereupon were taken in good faith and for a legitimate purpose, they are in all things regular in form, and the premises covered by the said alleged deed of trust, dated 12th September, 1809, have been thereby legally and effectually discharged from the pretended trust alleged to have been by that deed created.

VI. Under the conveyances made to him by Westervelt and De Garmo and their respective wives, the defendant, E. W. Miller, acquired a perfect title to the premises thereby conveyed, discharged from all and every trust whatsoever, and from the time of those conveyances he has held the said premises in his own right and for his own use.

VII. The bill filed by Hannah Miller can in no way aid or support the bill in this cause. That bill was the commencement of a separate and distinct suit, which must stand by itself and be determined on its own merits.

VIII. The allegations in the bill relative to alleged incontinence, or improper conduct on the part of the defendant, E. W. Miller, are wholly irrelevant and immaterial to the matters in controversy. They were inserted for the purpose of raising false issues and to prejudice the said defendant. They are untrue in fact; and all such allegations, and the proofs on the same subject, should be wholly rejected.

IX. The equities of the case, in every point of view, are in favor of the defendant, E. W. Miller, and the court will not feel bound to go beyond its common and well settled rules and principles to set aside proceedings shown to have been taken openly, honestly, and with the best intentions, and to have been in every way beneficial to the parties in interest.

X. The complainants are entitled to no account or other relief, and their bill should be dismissed with costs.

In behalf of the same defendants in the cross suit, the following additional points were made :

I. The bill in this cause was the commencement of a new suit, which must be decided by itself and on its own merits. It can be in no way connected with the suit of Wright and others.

II. The deed of trust, dated 12th of September, 1809, made by complainant, (then Hannah Ryerson,) in contemplation of her marriage with defendant, E. W. Miller, was a fraud upon him, and no relief founded on that deed can be given against him, and as between him and this complainant, no acquiescence can make that deed valid.

III. Whatever may be the effect of the sales to Westervelt and De Garmo, and the proceedings thereupon as to third persons, they are at all events valid and effectual to vacate and avoid the said alleged trust so far as this complainant is concerned. She executed and acknowledged the deeds. She signed and swore to the answers affirming them, and was particeps in the whole transaction. In all this she acted voluntarily, understandingly, and without influence of her husband, and she is irrevocably bound by the proceedings.

IV. The said complainant also united in the subsequent disposition, made by E. W. Miller, of the property, and accepted an annuity of $600 per annum, which has been always regularly paid. She had a right to dispose of her property as she pleased, and she has effectually disposed of the whole of it. On this ground also, her bill must be dismissed.

THE ASSISTANT VICE-CHANCELLOR.—This controversy depends almost exclusively upon the pleadings and the documentary evidence ; and the great mass of the oral testimony taken in the two suits, by which the parties have fully succeeded in blackening the character of the two heads of their family, and exhibiting their depravity to the public gaze, has no bearing upon the merits of the case. It is a relief to be spared from further examination of its disgusting disclosures.

Wright *v.* Miller.

I will first consider the claim made by the original bill, in behalf of the children of Ezra W. and Hannah Miller.

And the first point to be determined is, the validity of the deed of trust executed by Mrs. Miller, then Hannah Ryerson, to Robert Campbell, on the 12th of September, 1809. The bill states that it was given *in contemplation of her marriage* with Ezra W. Miller. In his further answer, Miller declares his entire ignorance as to this fact. If he had believed so important an allegation as this was to his own case, he would have readily admitted its truth in his answer. In his answer to Westervelt's bill filed in 1815, and hereafter mentioned, Miller states that the trust deed was executed by Hannah Ryerson, because she found it difficult to attend to the management of her real estate, it consisting of detached, and some of them distant pieces,&c.; and making no allusion to her intended marriage as one of her motives. The statement of the trust itself in the bill is general, and the children may be presumed to have been unacquainted with its particular circumstances. It is proved that the deed was not executed in contemplation of the marriage; and I do not think that I ought to hold the complainants to the statement in the bill against the truth of the case, when the defendant has not relied upon the statement in his answer. This relieves the deed from all imputation of fraud upon the marital rights of the husband. It is not asserted that any misrepresentation in regard to her property was made to Miller, while he was paying his addresses to her. And the conveyance having been made before he became her suitor, it is binding in the absence of any positive deception practised upon him. *Countess of Strathmore* v. *Bowes*, (1 Ves. Jr. 22. 2 Bro. C. C. 345, S. C.) 1 Roper's Husband and Wife, by Jacob, 163–4.

There is strong reason to believe that Miller knew of the trust deed before the marriage. Hannah Ryerson was of full age before his courtship. Hence his application to Mr. Campbell on the subject, could not reasonably be referred to Mr. C.'s guardianship of Hannah R. during her minority. She was residing in a country town, where such a trust would be the more bruited about, because it was uncommon. It was general-

ly known among her neighbors. Mr. Campbell took it for granted, from Miller's applying to him, a stranger to M., that the latter knew all about the conveyance to C. And it is difficult to account for it on any other hypothesis. Miller's omission to complain of the trust after the marriage, corroborates this view of the case.

This leads to another consideration, which is decisive against him. His conduct in relation to the trust deed subsequent to the marriage, was a confirmation of its validity. Instead of impeaching it and setting it aside as a gross fraud upon his rights, as soon as he heard of it, (if he first learned its existence after the marriage,) when the occurrence was fresh and the proofs at hand, we find him making it a merit in his answer that he never intermeddled with the trustee's control, until after the conclusion of the proceedings in equity hereafter discussed. And when he resorted to those proceedings, for the avowed purpose of discharging the property from the trust in question, after advising with eminent counsel upon the subject, he ventured no attack upon the deed on this ground. On the contrary, his whole fabric was erected upon the foundation that the trust conveyance was valid as between himself and the parties thereto. At this late day he cannot be permitted to question it.

I will therefore assume, that on the 28th day of January, 1810, when Ezra W. Miller intermarried with Hannah Ryerson, Mr. Campbell was seised and possessed of all the real estate, with the usual powers of a trustee, in trust for her support and maintenance during her life, free from the control of her husband or any other person, for her own use and on her separate receipt only ; and also in trust to apply the residue of the property and its proceeds, for and towards the bringing up, education and support of her children in a just and rateable proportion as might be required during the life of such child or children, if she should leave any her surviving ; and if she should die without leaving any child her surviving, then in trust as to the residue, for the child or children of her brother Samuel E. Ryerson or their heirs ; and failing issue of her brother, then such residue was to go to the trustee absolutely. This is substantially the result of the deed. I may have occasion to refer

to its details hereafter ; and express no opinion here as to who would be entitled to the capital after the death of Hannah Miller.

The next question arises upon the conveyances made by Miller and his wife to Westervelt and De Garmo, the proceedings in chancery by Westervelt and De Garmo respectively, and the re-conveyance of the same premises by them to Miller. The result of all which was the divesting of the title of Mr. Campbell, the trustee, in all the trust lands, excepting two acres near Little Nutten Hook, which appear to have been overlooked, and the vesting of the same title in Miller absolutely, and discharged from the trust.

Before these transactions, and in the year 1811, Mr. Campbell had obtained a partition of a part of the real estate in this city, in which he owned one-fourth in trust, and there were allotted to him for Mrs. Miller and her children, in severalty, the house and lot No. 169 Greenwich-street, and lots on Washington and West streets, designated in the pleadings as Nos. 1010, 1011, 1020, and 1029. Several of the parcels embraced in the partition were sold by the commissioners, and Mr. C. received one-fourth of the net proceeds.

In effecting the change in the title, and destroying the trust, the following course was pursued. On the 22d of March, 1813, Miller and his wife, by a deed with full covenants, and expressing a consideration of $11,100, conveyed to Albert A. Westervelt, in fee, the house and lot 169 Greenwich-street, and one undivided fourth part of the premises 128 Pearl and 92 Water streets, of the Newburgh farms, and of the Little Nutten Hook property, all of which were owned by Mr. Campbell in trust. The deed was duly acknowledged, but was never recorded. On the 2d day of September, 1813, Westervelt filed his bill in this court against Miller and his wife, R. Campbell, and the two children who are complainants here. The infant children of Samuel E. Ryerson were afterwards brought in by an amendment, and Joseph Miller was made a party after his birth in 1814. Ezra, the third son, was not made a party. This bill states the purchase by Westervelt from Miller and his

wife, for a full and valuable consideration, and without notice of the trust deed ; that he has since heard of the latter ; that it was voluntary and without consideration, and he prays to have it set aside as void against him. The bill also states that Westervelt gave his bond to Miller for the purchase money, and that he has since paid it, and the same was delivered up and cancelled. Mr. Harison signed the bill as counsel. To this bill the parties answered in 1815. Miller and his wife put in a short joint answer, admitting the statements made in the bill, and expressing their willingness to join in discharging the property from the trust. Their answer on file was evidently drawn up before the bill was amended. Mr. Campbell put in a like answer, submitting himself to the decree of the court. These answers were filed by Mr. Munro, as solicitor and counsel.

Miller was appointed the guardian ad litem of his infant children, (the eldest of whom was less than three years old when the bill was filed,) and as such put in an answer admitting the facts stated. No answer is found on file, but there is a replication to such an answer, and Miller states that he put one in. Ryerson, as guardian ad litem of his infant children, put in a like answer. Mr. Munro signed the answers of both the guardians as counsel. It is a circumstance indicating still farther the amicable character of the suit, that the bill, the answer of Miller and wife, and the four replications on file, were all written by the same hand. The only proofs taken in the cause were documentary. On the 27th day of December, 1815, it was brought to a hearing upon a case signed by the solicitors and counsel of the respective parties, and a decree made declaring the conveyance to Campbell to be void as against Westervelt, and directing Campbell to release and convey to W. the premises included in the deed from Miller and wife to him. The decree provides no day in court for the infants to show cause. Indeed no mention is made in the decree of the infancy of any of the parties. The cause is entitled as if all the parties were adults, and no allusion is made either to infants or guardians ad litem.

On 1st day of March, 1816, Mr. Campbell conveyed to Wes-

tervelt, in pursuance of the decree, and on the 28th day of the same month, Westervelt re-conveyed the whole premises to Miller, by a deed expressing a consideration of $11,500. These two deeds were recorded together on the 5th day of December, 1818.

On the 21st day of January, 1817, Miller and his wife for the expressed consideration of $12,900, conveyed in fee with full covenants, to William De Garmo, all the remaining trust property, except the two acres near Little Nutten Hook. The deed was duly acknowledged, but was not recorded till 1823.

In December, 1819, De Garmo filed a bill in this court, similar in all respects to that of Westervelt, in which Miller and wife and their four children, the four children of Ryerson, and R. Campbell the trustee, were made defendants. The same proceedings were had in this suit as were taken in Westervelt's, Miller appearing and answering as guardian ad litem for his children ; and a like decree was made on the 30th day of June, 1820. The answers and replications were all filed May 13, 1820, and all of these pleadings except Campbell's answer, are in the same handwriting. The bill was filed by the same solicitor who filed Westervelt's bill, and it appears to have been signed by Mr. Harison as counsel, and his name then erased. The answer of R. Campbell was put in by Mr. Harison as solicitor and counsel ; the answer of Miller and wife by Mr. Munro as solicitor and counsel, and Mr. Munro signed as counsel for the two guardians ad litem. Miller was appointed guardian on his own petition. In this case the decree recites that the cause came on to be heard on pleadings and proofs ; and the rough minutes of the hearing mention the reading of the depositions of three witnesses. One of the three was a subscribing witness to the deed to De Garmo, and it appears by the examiner's certificate on the deed, that it was exhibited in the cause to the three witnesses named in the rough minutes. From these circumstances, and the presumption that the statements in the bill, which are now clearly shown to be false, could not then have been proved, I infer that the testimony was formal and documentary, and that the decree, like that of Westervelt, was made principally by consent or on the state-

ments of counsel. The rough minutes show that the note of issue was filed and an order made for putting the cause upon the calendar, the same day that the decree was moved and taken.

In pursuance of the decree, Mr. Campbell released and conveyed the premises to De Garmo on the 31st day of July, 1820, and on the 26th day of August, 1820, De Garmo re-conveyed them to Miller by a deed expressing the consideration of $12,000. These two deeds were recorded together on the 27th day of November, 1820.

This is the record and written evidence of the transaction. It appears by all the evidence in the case, that Miller instituted these proceedings for the avowed purpose of obtaining the control of the property, freed from the trust. He states in his answer, that the estate required great and constant care and attention, and large outlays of money, beyond the income of the property, to render it productive, and to fill up lots, &c. That Campbell, early in 1813, applied to him to take the control and charge of it, and improve it as its situation required. That he, Miller, believed it would be most for the interest of all concerned that the estate should be managed by some one interested therein, and who would provide funds for its improvement, and told Campbell that he was willing to take the care and management of it, provided the title could be vested in him, so as to give him the legal control of the property. That he consulted Richard Harison and Peter Jay Munro, Esquires, and told them the parties interested were all willing and desirous to have the change made ; that they advised the measures which were subsequently pursued to effect the object ; and that he gave the deeds to Westervelt and De Garmo in consequence of such advice, and with the intent of releasing the premises from the effect and operation of the trust deed. That he expected Westervelt and De Garmo would procure the premises to be discharged from the trust deed by proceedings in this court, and after effecting it, that they would reconvey them to him, although there was no agreement to that effect. And that Westervelt and De Garmo expected to make such re-conveyance.

The means resorted to were in character with the object in view. A full consideration was inserted in the deeds and covenants of title, as if on a cautious and well considered purchase, when in fact no consideration was paid. The very faint allegation of the payment of the consideration, made by Miller in his answer, is of no weight. The testimony that De Garmo was worth but two or three thousand dollars; the object of the transfer; and the testimony of De Garmo himself, are conclusive that no consideration passed in his case. As to Westervelt, we have no proof from him. His answer is of no consequence, for this is on a point in which he has no interest, and it is not evidence for Miller. But the testimony shows that he was not in a condition to make such a purchase, and that his personal security was not good for any such amount. This, in connection with the other facts, satisfies me that no money was paid, either on the deed to him, or his re-conveyance.

I do not propose to allude to the bond said to have been given by Westervelt and paid within a few months, nor to consider the possibility that the parties went through the form of delivering the money and having it immediately returned. I am speaking of the substance of the affair.

The bills were doubtless filed at the instance of Miller. His counsel were employed, and De Garmo says that he employed none. The statement in the bills, that Westervelt and De Garmo respectively, purchased in good faith and without notice of the trust deed, a statement indispensable to sustain their case, was utterly false. We have seen how it was as to the consideration. As to notice, De Garmo testifies that Miller stated to him the object of the movement, when he was applied to by M. to receive the deed, and Miller himself says in his answer, that he mentioned to Westervelt and De Garmo, the advice given to him by his counsel in reference to relieving the premises from the effect of the trust, and that according to such advice the premises conveyed to them might, by the aid of the Court of Chancery, be discharged and released from that trust. Moreover the trust deed was recorded in 1809; and no bona fide purchaser of so large a property would probably have omitted to search the title.

Having got up a case, and filed bills in the names of Wester-velt and De Garmo, containing this false ground for relief, Miller next figures on the other side. He with his wife, answer on oath, admitting the false statement to be true. Mr. Campbell makes a like answer. There were infants of very tender years who had the principal interest in the trust, and it was barely possible that their guardian ad litem might stumble upon the truth, or at least require some proof, and thus defeat the whole scheme. This difficulty was obviated by Miller himself becoming the guardian ad litem, and putting in an answer for his children, admitting all the facts. The real complainant, whose whole interest was adverse to that of the infants, and whose whole design by the proceedings was to deprive them and their heirs of the trust estate, was appointed to watch over and protect their rights. The hungry wolf selected to guard and protect the lambs of the flock.

Where all was admitted, and all interests represented by one person, there would of course be small need of testimony, and accordingly, decrees were made in both suits without reference to the proofs. This is shown by the decree in the one case, and the two were so entirely homogeneous, that there is no doubt but that it was so in the other, as I have already observed. All the parties who were represented in the case, appeared by the counsel for Miller who originally advised him in the premises.

Much stress was laid by Miller's counsel at the hearing, upon the conceded high moral and professional character of those gentlemen. I do not perceive that it affects the inference from the facts. I have no doubt but that Messrs. Harison and Munro, were deceived and imposed upon by their client. He says that he informed them that all the parties consented.

They advised him that a bona fide purchaser of the premises without notice, could hold them against Mrs. Miller's prior voluntary deed. They doubtless supposed that Westervelt and De Garmo were such purchasers. How could they think otherwise, when Miller had admitted them to be such in his sworn answer? Miller had to deceive the eminent counsel employed, in order to make them the instruments of deceiving

the court. And the decrees were made upon the admissions of the parties, and the exalted character of the counsel who appeared to sustain the case.

I need not stop to review the considerations and pretences, by which Miller attempts to gloss over this transaction, and to induce the court to believe that it was done from the best of motives and for the most praiseworthy ends. He may have satisfied himself of all this ; and I presume that he was perfectly sincere in believing, that the property in question would be much better cared for and more productive, if *owned by Ezra W. Miller* and in his control, than it would be while owned by his wife and children and controlled by Robert Campbell. But it is impossible to wink so hard as not to see that the ruling and absorbing motive for these proceedings, was the absolute control and ownership of the property. If the trustee were unmindful of his duty, the Court of Chancery would have removed him. If funds beyond the income were necessary to improve the property, the trustee could have raised them on mortgage, as well as Miller himself, and even better, with Miller's co-operation. And if circumstances wholly unforeseen at the creation of the trust, made it imperative to part with a portion of the property, in order to preserve the residue, the court of chancery would have directed its sale. All these objects could have been accomplished with less trouble and expense than the proceedings in question, and without any resort to fictitious sales, false issues, or deception of the court and counsel.

The result of the conveyances and chancery proceedings was, that Miller, who, when he married Hannah Ryerson, had no property, became without any consideration paid for it, the absolute owner of a large estate, which had belonged to her and her children.

The bill in this suit charges that the sales to Westervelt and De Garmo were not made in good faith, but were made for the sole purpose of avoiding the trust. So far we have ascertained that the bill is true. The bill further charges, that the suits of Westervelt and De Garmo in this court, were commenced by collusion with Miller, and at his suggestion. Of this there can

be no doubt. The bill also charges that the decrees obtained in those suits, were fraudulently obtained, and were void and erroneous as to the children of Miller.

I think that this too is abundantly proved. Miller was both plaintiff and defendant. Indeed, acting through his counsel, who represented both parties, it may be said that he was the judge who decided, as well as the party who moved. Under the more guarded practice which now prevails in this court, a similar case will probably never occur. A party whose interest is wholly adverse to the infant's, cannot become his guardian ad litem. (Rule 146; 1 Hoff. Ch. Pr. 171, note 4.)

Considering Miller as the guardian ad litem of the infant defendants, and leaving out of view his hostile interest, he was recreant to his trust. He knew perfectly well that the statement in the bills of Westervelt and De Garmo was false ; yet he admitted its truth in behalf of the infants, and aided in palming it upon the court. He is liable to the infants for all the damages which they have sustained by this neglect of his duty. (*Knickerbacker* v. *De Freest,* 2 Paige, 304 ; *Caldwell* v. *Taggart,* 4 Peters, 190.) And he cannot be permitted to retain the fruits of his sacrifice of their rights.

As the plotter and manager of the whole proceeding, I must hold Miller responsible for the fraud perpetrated on the court, as well as the infants, by his answer as guardian, and the subsequent assent of his counsel to a decree thereon. The answer of an infant by his guardian is in truth, the answer of the guardian, and not of the infant. ( *Wrottesley* v. *Bendish,* 3 P. Wms. 336.) Hence, the infant is not bound by his answer, it cannot be read against him, and no decree can be made on the admission of facts which it contains. (1 Daniell's Ch. Pr. 236, 238. 1 Hoff. Ch. Pr. 232 and 243, note 1, and cases cited.) Where there are infant defendants, and it is necessary in order to entitle the complainant to the relief he prays, that certain facts should be before the court, such facts, although they might be the subject of admission on the part of the adults, must be proved against the infants. (1 Daniells' C. P. 238. *Mills* v. *Dennis,* 3 J. C. R. 367.) In *Wilkinson* v. *Beal,* (4 Madd. R. 408,) Sir John Leach refused to receive the ad-

mission in an infant's answer as evidence against him, that one of his co-defendants was out of the jurisdiction of the court.

If the absence of proof in the suit of Westervelt had come to the notice of the Chancellor, no such decree would have been made against the infant defendants. The want of proof was concealed from the court by the circumstance of the counsel assenting to the decrees; not with any impropriety or wrong on their part as counsel, but by the fraud of the guardian, Miller, in admitting the facts, and inducing the counsel to believe their truth. In fact, from the silence of both decrees as to the existence of any infancy or guardianship in the causes, it is a just inference that those circumstances were never brought to the notice of the court, and that the decrees were made without examination, as they would have been made between adults.

It is evident that the suits of Westervelt and De Garmo were merely formal, and were carried through as amicable suits, and under the direction of one person, or at least by concert of all who acted in the proceedings. And if there had been no infants whose rights were overlooked or trampled upon, by the contrivance of the principal manager, this court would not have been called upon to interfere.

In fine, I look upon the whole proceeding, so far as the infants are concerned, as one of the grossest frauds that ever was sanctioned by the forms of law. The interest of Miller, as the real complainant in the suits, was concealed from the court; he foisted upon its records false statements to induce its equitable interposition ; he procured himself to be made the guardian ad litem, of the infant defendants, while utterly hostile to their interests, in order to admit the truth of the false gravamen, and carry it through without proof, and without attracting attention; thus doubly imposing upon the court, and violating his duty as guardian, in aid of the robbery of his own children ; and under such circumstances obtained the decrees in question for his exclusive benefit. A court of equity would be undeserving of the name, if it were incapable of granting relief against such a flagrant abuse of its own powers and forms of proceeding.

The jurisdiction of this court to set aside decrees obtained by fraud, on an original bill filed for that purpose, has long been unquestioned. See *Richmond* v. *Tayleur*, (1 P. Wms. 734.) *Loyd* v. *Mansell*, (2 id. 73.) *Galley* v. *Baker*, (Cases Temp. Talb. 199.) *Barnesly* v. *Powell*, (1 Ves. Sen. 119.) *French* v. *Shotwell*, (5 J. C. R. 555, 565.) 1 Daniells' Ch. Pr, 244–5. Mitford's Pl. by Jeremy, 93.(*a*)

In *Carneal* v. *Wilson*, (3 Littell's Rep. 80, 90–1,) where this jurisdiction was upheld, the concealment of material facts from the court by the party obtaining the decree, was considered as fraudulent.

The omission to insert in the decrees a day for the infants to show cause, after they became of full age, was erroneous. *Mills* v. *Dennis*, (3 J. C. R. 367.) *Bennett* v. *Hamill*, (2 Sch. & Lef. 566.) And see *Perry* v. *Phelips*, (17 Ves. 174.) Wyatt's Pr. Reg. 225. 1 Daniells' Ch. Pr. 225, et succ.(*b*)  And this is an error which is to be examined on a bill of review, or on an original bill. (1 Daniells, 245, and *Richmond* v. *Tayleur*, above cited.) So that if there were no positive fraud shown in obtaining the decree, yet if the facts on which it was made did not warrant it, the complainants might claim relief from it in this suit against Ezra W. Miller. And see *Blacklow* v. *Laws*, (2 Hare's R. 40,) where V. C. Wigram refused to compel a purchaser to take a title derived under a decree in which a sale of a trust estate had been decreed against infants, because it did not appear that a case had been made for the exercise of that extraordinary power, and therefore the decree might be altered on a re-hearing at the instance of the infants.

What I have already said renders it needless for me to speak of the pretence of Miller, that he is to be regarded here as a bona fide purchaser of the property under the decrees. A thousand such doublings and shiftings in his course of dealing with this estate, to get it into his own hands, freed from

---

(*a*) For the distinction between fraud and collusion in decrees, see *Meddowcroft* v. *Huguenin*, 3 Curteis, 403, and 8 Lond. Jur. Rep. 431.

(*b*) See farther on this subject, *Harris* v. *Youman*, 1 Hoff. Ch. R. 178.

the trust, would not conceal his bad faith from the searching eye of the law, or enable him to pass as an honest purchaser, under a decree.

The annuity for his wife and the trust deed for his children, hereafter mentioned, were also urged as proof of his honesty and good intentions in procuring the destruction of the Campbell trust. The merit of these acts in reference to that transaction, is much eclipsed by Miller's positive statement in his answer, that they were made of his own accord, purely *suo motu*, and without any interference or influence of Campbell or any one else. I entertain no doubt from the testimony of Mr. Campbell; in connection with the circumstances, that before the machinery was set in motion to divest the trust, there was an agreement or distinct understanding between Miller and Mr. C. and perhaps Mrs. Miller also, that Miller after he became vested with the title or the proceeds, would make a settlement out of it for the benefit of his wife and children, and that Mr. C. relied with implicit confidence upon the eminent counsel whom he had consulted with Miller on the subject, to bring about such a disposition of the proceeds of the estate. It is impossible on any other supposition, to absolve Mr. Campbell from a gross and wanton sacrifice of his trust.

But this assumption does not relieve Miller from the charge of fraud in reference to the infants. If a bill had been filed to effect a change in the trusts, setting forth fully and fairly what was desired, and the objects and motives for the change, this court would, perhaps, have granted the relief sought. But that is not this case.

The danger to be apprehended from setting aside decrees of this court, which was strongly portrayed by the learned counsel for Miller, is, I imagine, greatly overrated. The amicable suits to which he referred, were those where, on a state of facts ascertained in regular form, the opinion of the court was sought upon the validity or construction of some trust or devise. I think no case can be found, save these of De Garmo and Westervelt, where the court was induced to set aside a trust on a false state of facts, as against infants, and, in one of the cases at least, without proof of the facts stated. It is to be observed,

that, in this case, the rights of innocent parties, who have purchased upon the faith of the decrees of the court, do not intervene to prevent justice from being executed.

It was urged in behalf of Miller, that the complainants in the first suit, have no existing interest in the trust fund, and therefore no right to institute a suit on account of it. I think they may maintain a suit. Their interest is vested, and it is an existing interest, although the time of its enjoyment has not arrived. The trustee was to invest and accumulate all the income of the . fund not required for their mother's support and maintenance, and after her death was to apply the residue of the estate for the support of her children. This application does not appear to be limited to the income merely ; but that is not important. The interest of these parties in the preservation and proper management of the trust fund, is manifest. And the defendant, Ezra W. Miller, having by a series of wrongful and fraudulent acts, obtained the possession and control of the fund, and sold and otherwise appropriated it ; the reversionary beneficiaries in the trust, may well apply to this court to have it restored and re-invested in trust for their benefit. *Scurfield* v. *Howes*, (3 Bro. Ch. C. 90, and id. 95, note 8, by Mr. Belt,) is a case where reversioners were allowed to file a bill to protect the fund. In *Waller* v. *Fowler*, (1 Sausse & Scully's R. 274,) the Master of the Rolls in Ireland sustained a ne exeat on a similar bill, although none of the cestui que trusts had a present right to any part of the principal fund. And see *Merril* v. *Johnson*, (1 Yerg. R. 71,)(a)

The decrees in the suits of Westervelt and De Garmo, must be declared to be fraudulent and void as against the children of Mr. and Mrs. Miller. So far as the property which Miller obtained from the trust through those decrees, remains in his possession, it is still affected by the trust, and the court may follow it. *Rutledge* v. *Smith*, (1 M'Cord's Ch. R. 132.) *M'Clanahan* v. *Chambers*, (1 Monro's R. 44.) The lands which he has sold and conveyed to bona fide purchasers with-

(a) See also Jeremy's Eq. Jur. 350, and the cases cited.

out notice, will be unaffected by this decree, and for those Miller must account.

I will discuss the particular relief which should be granted in this case, after disposing of the second suit.

SECONDLY.—The claim set up by Mrs. Miller in the cross bill.

The first point made on this by the defendant, Ezra W. Miller, is that it is an original, and not a cross suit. It is not perhaps material, in the result to which I have arrived on both bills, whether it be the one or the other. I think, however, that Mrs. Miller's bill, may be regarded as an original bill in the nature of a cross bill. It is founded on her claims against her co-defendants, which are in some measure collateral to those set up by the original suit. (Lube's Eq. Pl. 228, part 2, ch. 3, § 5.) And it was certainly very proper and more convenient to all the parties, that the conflicting claims between Mr. and Mrs. Miller, should be adjusted at the same time, with the kindred claims of their children derived from the same source. (See 1 Hoff. Ch. Pr. 345–6.) On the original bill, the court could not determine the opposite interests of Miller and his former wife, although they were involved in the controversy made by that bill. (Mitford's Pl. by Jeremy, 82–3.)

I have already stated my conclusion, that the conveyance to Mr. Campbell in trust, made by Mrs. Miller before her marriage, was valid; and this disposes of the second point made by Miller in her suit.

Before proceeding to his other points, I must briefly state another branch of this case.

On the 11th day of March, 1820, Miller executed, in the presence of the solicitor who filed the bills of Westervelt and De Garmo, two sealed instruments. One was an agreement with his wife and Mr. Campbell, and executed by them also, reciting that Miller and his wife were living separate from each other, and that he had agreed to pay her $600 per year during her life, in quarterly payments; and he thereby covenanted with Mr. C. to pay that sum, with a proviso, that if she survived Miller, she should release to their children her dowe

in the lands of which Miller should die seised. The other agreement was executed by Miller and Westervelt. It recited that Miller was desirous of making some provision for the four children of himself and his wife Hannah, and he then covenanted with Westervelt that he would within one year, convey to W. in fee, real estate in New-York or ₁New-Jersey, of the value of $12,900 upon trust : 1. To permit Miller to receive the rents, &c., during his life. 2. and 3. Upon his death to convey the premises to the four children in fee, and their heirs, with survivorship to the others in case of the death of either without issue. And 4. If all the children should die without issue in Miller's life-time, then to convey the premises to his wife in fee, and if she should not be living, then to the lawful issue of Samuel E. Ryerson ; and failing such issue, then to the right heirs of his wife, Hannah Miller.

On the same 11th day of March, 1820, Miller executed to Campbell a mortgage on the house and lot 169 Greenwich-street, to secure the payment of the annuity to Mrs. Miller; and in the month of June, 1821, he conveyed lot 187 Washington-street, (known as No. 1011, in the pleadings,) to Campbell by way of mortgage, further to secure the annuity. In July, 1821, he conveyed both the Greenwich and Washington-street lots to Westervelt in fee, upon the trusts expressed in the instrument dated March 11, 1820.

Mrs. Miller had been living apart from her husband about three years previous to the execution of these agreements, and never has resided with him since. On the 18th day of June, 1822, Miller obtained a decree of divorce *a vinculo*, against her in this court.

The annuity secured by the agreement and mortgages, had been regularly paid to Mrs. Miller from its institution, to August, 1840, since which period, the testimony does not state any thing on the subject.

The trust vested in Westervelt, is now vested in the Clerk of this Court, Mr. Westervelt having died *pendente lite*.

It was conceded by her counsel, that Mrs. Miller had full power to convey her life estate in the trust vested in Mr. Campbell for her benefit. *Jacques* v. *Methodist Episcopal Church,*

(17 Johns. 548.) But it is contended that her intention was merely to change her trustee by substituting her husband in the place of Mr. C.; and that Miller's procuring the title to be conveyed to himself absolutely, was a fraud and imposition upon her, which renders the whole proceeding void. This view of the case yields all claim in her behalf, founded upon the undue influence or control of Miller, in procuring her to execute and acknowledge the deeds to Westervelt and De Garmo, and to sign and verify the answers in their suits. It would be in vain to urge such a claim. She scarcely shadows it forth in her cross bill. There is not the slightest proof of it, and many facts in evidence tend to establish that she acted freely and voluntarily, if not understandingly. Thus, the deed to De Garmo was probably executed, after the separation. It appears by the certificate of the acknowledgment, that its execution was proved as to Miller, and acknowledged by Mrs. Miller in this city, she then residing in New-Jersey; and it is thus shown that Miller was not in attendance when she went to the officer for that purpose. When she joined her husband in putting in the answer to De Garmo's bill in 1820, she had been living apart from him a long time, and the conduct of both parties at that period, exhibited an entire destitution of conjugal regard.

She joined her husband, previous to the divorce, in the execution of several deeds which he gave on sales of portions of the estate which had become vested in him through Westervelt and De Garmo; all of which deeds were given after the separation.

It is impossible to believe that she acted in these matters under any undue influence or control of her husband. It is probable that she was guided by the directions of Mr. Campbell.

To recur to the point made, that there was fraud and imposition practiced upon her, and that her intentions were not carried out, and the contrary position on the other side. So far as we have any evidence of mutual intention, it is that which I have already mentioned as inferrible from the facts and the testimony of Mr. Campbell. That intention does not appear to have been specific or definite. It does appear to have been

Wright *v.* Miller.

carried out by Miller in 1820 and 1821, by the annuity, the mortgages, and the trust in Westervelt; to the satisfaction of all the parties to the intention, and their counsel.

If to all this evidence, we add the sanction of Mrs. Miller to the arrangement, a sanction renewed every quarter, for eighteen years after she became a feme sole; her acquiescence without complaint for fifteen years after that event; and the evidence furnished by her letters to the complainant within a few years past, not only of her acquiescence and sanction, but of her indisposition to have the existing arrangement disturbed; it appears to me to be perfectly conclusive against the case made by her cross bill.

It was suggested by Mrs. Miller's counsel that she received the annuity by sufferance merely, and that it was cut off by the divorce. I apprehend that the divorce did not affect it at all. (See *Sidney* v. *Sidney*, 3 P. Wms. 269; *Blount* v. *Winter*, id. 276, note by Cox; *Field* v. *Serres*, 1 Bos. & P. New Rep. 121; Shelford on Marr. and Div. 421–2; Roper's Husb. and Wife, by Jacob, 134, 137.)

It will be proper in settling the decree in the original suit, to provide for the continuance of the charge of this annuity upon that portion of the trust property which was mortgaged for its security; and this will obviate any possible doubt of its validity.

It is the course of the court where a decree has been obtained by fraud, to restore the parties to their former situation, whatever their rights may be. *Birne* v. *Hartpole*, (5 Bro. P. C. 197, Tomlins' ed.;) *Carneal* v. *Wilson*, (3 Litt. 90;) Mitford's Pl. 93.

In this case, the premises at Little Nutten Hook, and 169 Greenwich-street and 187 Washington-street, remain in specie. The trust in Westervelt in the two latter will be declared void, and those premises restored to the original trust. As the mortgages securing the annuity will determine at the same time that the children will be entitled to an interest in possession, they will not affect the trust for the children and heirs.

The farm owned by Mr. Miller at Flushing, was in part purchased with the trust estate, viz., the proceeds of part of the lot 1020, and of the long lease of the 40 acres at Bull's Ferry.

Wright *v.* Miller.

I shall declare that the Flushing farm is to be deemed a part of the estate which was vested upon the original trust.

Then in regard to the Newburgh farms, the lot in Pearl and Water-street, and the other property derived from the trust, and converted to his own use by Miller; there will have to be a reference, to ascertain what those items of the estate would have been worth at the present time. The master upon the reference will inquire and report what sum must be restored by Miller and invested, in order to place the trust estate upon the same footing that it would have been, if the Westervelt and De Garmo proceedings had never occurred. To this end, in addition to the value of the premises sold, the master will ascertain what sums were laid out by Miller in such permanent improvements and additions to the premises, as have not been compensated to him by the enhanced value of their income. And also, what amount, if any, the trustee on a faithful administration of the trust vested in Mr. Campbell, would have been enabled to accumulate and invest; and the latter amount is to be offset against the expenditures for improvements. The master will report a new trustee or trustees, in whom the trust estate is to be vested. The complainants may elect before the master, whether they will have the Flushing farm go into the trust in specie; and the master, in case they so elect, will credit its value in stating the account, and charge Miller with the trust items which went into its purchase. In case they elect not to have the Flushing farm made a part of the trust estate, the latter items only will enter into the account. On the confirmation of the master's report, the premises remaining, viz., the property at and adjoining the Little Nutten Hook, the lots 169 Greenwich and 187 Washington streets, and the Flushing farm in case of such election, are to be vested in such new trustees, on the original trusts of the deed of September, 1809; except that the trustee is to pay the annuity to Mrs. Miller, and is then to pay to Mr. Miller so much of the income as with the $600, will be equal to the provision made for Mrs. Miller by that deed. And Miller is to pay to the trustee, to be invested on those original trusts, the sum which the master shall report as necessary to make the estate whole. It may be referred to the master

to report specifically what portion of the income shall be paid to Miller as before mentioned. Any surplus of income will be accumulated as directed by the original trust deed.

The decree will contain the usual clauses for enforcing its provisions. And as the details of the relief were not spoken to by the counsel at the hearing, they may be discussed on settling the draft of the decree.

In regard to costs, Mr. Miller must pay the complainant's costs in the original suit. He is not to be charged with any costs for the testimony relative to his incontinence. I have felt some difficulty in respect to the costs of Miller in the cross suit. On the one hand, his general conduct towards Mrs. Miller has been censurable. On the other hand, the cross bill is indefensible. I have concluded to charge her with his costs, excluding the costs of all the testimony which was taken which is entitled in both suits, and that which relates to her licentiousness. The costs of the children in the cross suit may be paid out of the fund.

As to Mr. Campbell, it was stated at the hearing that the parties had stipulated as to the decree affecting him.

It appears that one of the parcels included in the deed to De Garmo, lot 1029, was omitted in the statement of that deed and of the subsequent proceedings thereon, in the original bill. Strictly, no relief can be decreed as to that lot in this suit, if the omission is insisted upon. I can perceive no advantage to the defendant, in urging its exclusion from the decree. He, however, has the right to exclude it, and in that case it will be omitted in the decree and account ; without prejudice to a new bill in that behalf, by the children or any of them.